# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY, INC., UNITEDHEALTHCARE SERVICES, INC., <br><br>      Plaintiffs, <br><br> v. <br><br> MICHAEL MURPHY, M.D., JESSE SAUCEDO, JR., SAMANTHA MURPHY, LYNN MURPHY, JULIE PRICER, MISSION TOXICOLOGY LLC, SUN CLINICAL LABORATORY LLC, SUN ANCILLARY MANAGEMENT LLC, INTEGRITY ANCILLARY MANAGEMENT LLC, ALTERNATE HEALTH LAB, INC., AND LMK MANAGEMENT LLC, <br><br>      Defendants. | CASE NO. 5:18-CV-347 <br><br> **COMPLAINT** <br><br> **JURY DEMAND** |

## ORIGINAL COMPLAINT

### INTRODUCTION

1. Defendants have executed a quintessential health care fraud scheme. They illegally induce requests for lab testing services. They then use financially-strained rural hospitals as "fronts" to conceal the true identity of the lab that performed the testing services. Defendants cause bills to be submitted for lab services, many of which were not ordered or not performed properly, and grossly inflate the prices of those services solely for their own financial gain. Defendants' fraudulent scheme not only steals from Plaintiffs ("United") and its plans, it

leaves patients with inadequate, sub-standard services and small rural hospitals in financial and operational disarray.

2.      Defendants are part of a nationwide problem. Congress and the Department of Justice have shown increasing concern with "the rising tide of health care fraud."[1] It has been estimated that health care fraud and abuse costs the national health care system $272 billion a year.[2] Much of this burden is born by private insurers such as United. But it is not just private insurers who are damaged by health care fraud such as that committed by Defendants. Health care fraud inevitably translates into higher out-of-pocket expenses for all consumers and extra expenses for employers and businesses.

3.      Dr. Michael Murphy is the architect of the fraudulent scheme and the owner and operator of a network of overlapping entities, including Sun Clinical Laboratories, Sun Ancillary Management, Integrity Ancillary Management, Alternate Health Lab, and LMK Management, which he uses to carry out the scheme with the knowing participation and assistance of the other Individual Defendants.

4.      Defendants' scheme is described with more specificity throughout this Complaint, but, very generally, it involves two steps.   First, Defendants induce health care providers, sometimes through kickbacks, to refer United members' lab specimens to Sun Clinical Laboratories or Mission Toxicology.   Second, Defendants set up "lab programs" at in-network rural hospitals, which they use to submit insurance claims to United that are intended to make it appear that specimens were referred to, and that testing was performed by, the rural hospitals. In reality the specimens were referred to and the testing was performed by out-of-network labs

---

[1] *See* 64 U.S. Attorneys' Bulletin, Nov. 2016, at pp. 7-8 (*available at*  https://tinyurl.com/ybzs2j8y).
[2] *Id.* (citing "Eliminating Waste in US Health Care," JAMA, April 11, 2012, Vol. 307, No. 14.

owned and controlled by Dr. Murphy and Jesse Saucedo, Jr., and then claims charging up to fifty (50) times the actual cost of the testing were submitted using the rural hospitals' identities.

5.     United processed the claims and reimbursed the services as though they were performed by the in-network rural hospitals, even though the vast majority—if not all of the testing—was actually performed by out-of-network labs located hundreds or thousands of miles away from the rural hospitals for a fraction of the cost billed. United also ended up reimbursing for lab testing that was not performed, not ordered, not performed as ordered, billed by another provider (*i.e.*, "double-billed"), and/or for which members and their providers never receive the testing results. As a result, United has been conned into paying at least $44 million for improper lab claims. As soon as UnitedHealthcare paid the rural hospitals, Defendants instructed the rural hospitals' employees to transfer 95% of the funds to their own entities.

6.     Some of the rural hospitals that Defendants used to launder their laboratory claims have caught onto the scheme and disavowed it. Newman Memorial Hospital filed suit in Oklahoma state court for, among other things, fraud and fraudulent transfers. Another rural hospital that Defendants used to launder lab services was forced into bankruptcy and has asserted in public filings that it was used to facilitate "a substantial fraud."

7.     Ultimately, Defendants' scheme is greed personified. Defendants made health care more complicated and more expensive than it should be to extract money to which they were not entitled. The scheme has defrauded United and is detrimental to the American health care system because it offers no benefit to patients, health care markets, or society at-large. Instead, Defendants' multi-million dollar heist threatens patients' health care and destabilizes rural hospitals' ability to provide care to their communities.

## PARTIES

8.　　Plaintiff UnitedHealthcare Insurance Company, Inc. is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of Connecticut.

9.　　Plaintiff UnitedHealthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota.

10.　　Defendant Sun Clinical Laboratory, LLC ("Sun") is a Texas limited liability company. Sun is licensed under the Clinical Laboratory Improvement Act ("CLIA") to perform lab services, but performed few, if any, of the lab services at issue in this lawsuit. Instead, Sun received requests to perform lab services but paid other out-of-network labs to actually perform the services. Sun is controlled by Dr. Michael Murphy, which lists him as "Chairman, Board of Managers," but because it is now essentially a specimen aggregator, it generally operates with indiscernible distinctions from Mission Toxicology, Sun Ancillary Management, and Integrity Ancillary Management. Upon information and belief, Sun's members are all residents of Texas.

11.　　Defendant Mission Toxicology, LLC ("Mission") is a Texas limited liability company. Mission is controlled by its managing member, Jesse Saucedo, Jr. Mission is licensed under CLIA to perform lab services but performed few, if any, of the lab services at issue in this lawsuit. Instead, Mission received requests to perform lab services but paid other out-of-network labs to actually perform the services. Mission is controlled by Jesse Saucedo, Jr., but because it is now essentially a specimen aggregator, it generally operates with indiscernible distinctions from Sun, Sun Ancillary Management, and Integrity Ancillary Management. Indeed, Mission and Sun conflate themselves in legal pleadings and Mission and Sun Ancillary Management conflated themselves in contracts with rural hospitals. According to Mission, it implements and

manages "lab programs" for rural hospitals and provides marketing services, insurance verification services, accessioning services, billing and collection services, and other management services for those rural hospitals, but this list of services is actually what is performed by Sun, Mission, Sun Ancillary Management, and Integrity Ancillary Management, together, as a single business enterprise. Upon information and belief, Mission's members are all residents of Texas.

12.     Defendant Sun Ancillary Management, LLC ("SAM") is a Texas limited liability company. SAM is owned by Sun. According to SAM, it implements and manages "lab programs" for rural hospitals and provides marketing services, insurance verification services, accessioning services, billing and collection services, and other management services for those rural hospitals. Again, this list of services is actually what is performed by Sun, Mission, Sun Ancillary Management, and Integrity Ancillary Management, together, as a single business enterprise. SAM is controlled by Dr. Michael Murphy and Jesse Saucedo, Jr. Upon information and belief, SAM's members are all residents of Texas.

13.     Defendant Integrity Ancillary Management ("IAM") is a Texas limited liability company. IAM was founded by Dr. Michael Murphy and Jesse Saucedo, Jr. IAM performs the billing and administrative services for the group of entities controlled by Dr. Murphy and Saucedo. Defendants use IAM as the rural hospitals' third-party biller to maintain control over the rural hospitals' billing operations. IAM submitted tens of thousands of intentionally misleading claims to United. IAM's managing members are Lynn Murphy and Jesse Saucedo, Jr. IAM's Chief Executive Officer is Lynn Murphy. IAM's Chief Financial Officer is Julie Pricer. Upon information and belief, IAM's members are all residents of Texas.

14.     Defendant Alternate Health Labs, Inc. ("AHL") is a Texas corporation.  AHL is located in the same building as IAM and performed the majority of lab services that were billed to United as though they were performed by rural hospitals.  AHL is managed and operated by Dr. Murphy and Jesse Saucedo, Jr., through LMK Management, LLC.  AHL is a wholly-owned subsidiary of Alternate Health Corporation, of which Dr. Michael Murphy is the C.E.O.

15.     Defendant LMK Management, LLC ("LMK") is a Texas limited liability company.  LMK's managing members are Lynn Murphy and Jesse Saucedo, Jr.  According to documents filed with the Canadian Stock Exchange, LMK is controlled by Dr. Michael Murphy and Jesse Saucedo, Jr.  LMK manages and operates AHL and, in exchange, receives 49% of AHL's "net revenue."  Upon information and belief, LMK's members are all residents of Texas.

16.     Defendants Sun, SAM, Mission, IAM, AHL, and LMK are collectively referred to as the "Entity Defendants."

17.     Defendant Michael Murphy, M.D. ("Dr. Murphy") is a Texas resident. Dr. Murphy is an architect of the fraudulent scheme described herein. He owns and/or controls Entity Defendants.  He received 1,920,000 shares of Alternate Health Corporation stock in exchange for developing AHL.  Dr. Murphy is now Alternate Health Corp.'s Chief Executive Officer, Chairman of the Board of Directors, and the company's largest individual shareholder (with approximately 5,840,392 shares).  He has created numerous "series" limited liability companies that are used as conduits for kickbacks to referral sources.  He executed agreements on behalf of SAM, Mission, Sun, and IAM that established the "lab programs" at Newman Memorial Hospital and Community Memorial Hospital.

18.     Defendant Jesse Saucedo, Jr. ("Saucedo") is a Texas resident. Saucedo is Dr. Murphy's business partner and a knowing participant in the scheme.  He founded, owns, and/or

controls Defendants Mission, IAM, and LMK. He executed agreements on behalf of Mission that established "lab programs" at Newman Memorial Hospital and Community Memorial Hospital. He executed an agreement on behalf of Sun that pays AHL $120 per specimen to perform toxicology testing on specimens referred to Sun. He was involved in instructing rural hospitals' employees to transfer millions of dollars to Sun, Mission, and IAM.

19. Defendant Samantha Murphy is a Texas resident. She is Dr. Murphy's daughter and another knowing participant in the scheme. She is a manager at IAM and is responsible for the submission of claims to payors, managing patient complaints and concerns, and instructing rural hospitals' employees to transfer money to IAM, Sun, and Mission. She also acts as IAM's "Compliance Officer" and, in that capacity, responds to requests for information on behalf of Sun and Mission.

20. Defendant Lynn Murphy is a Texas resident. She is Dr. Murphy's wife. She is IAM's Chief Executive Officer. She oversaw the submission of claims that represented that services were requested from and performed by rural hospitals, when she knew that those services were, in fact, requested from Sun or Mission and performed by AHL (in IAM's building). She also created documents that were submitted to United's investigators as Newman Memorial Hospital's policies, but which were false and only created in an effort to cover up the scheme.

21. Defendant Julie Pricer is a Texas resident. Pricer is a knowing conspirator and directed many of the financial transactions underlying Defendants' extraction of their ill-gotten gains from the rural hospitals. She is IAM's Chief Financial Officer. She oversaw finance and accounting operations for IAM, Sun, and Mission, submits invoices on behalf of all three

entities, and instructed rural hospitals' employees to transfer millions of dollars to IAM, Sun, and Mission.

22.     Defendants Dr. Murphy, Jesse Saucedo, Jr., Samantha Murphy, Lynn Murphy, and Julie Pricer are collectively referred to as "Individual Defendants."

23.     Defendants are all closely associated with one another.   Individual Defendants operate Entity Defendants as a single business enterprise; pooling resources, staff, information, and responsibilities to achieve a common business objective.   Mission and Sun gather requests for lab services.   LMK manages AHL's performance of lab services requested from Mission and Sun.   IAM prepares and submits claims seeking reimbursement from United for lab services, performs insurance verifications, accessions specimens, and maintains a web portal that allows referral sources to monitor lab results and claim adjudications and reimbursements.   Entity Defendants' operations all run through a warehouse located at 1051 E. Nakoma Dr., San Antonio, TX 78216.   AHL's laboratory and IAM's offices are located in this warehouse.

## JURISDICTION

24.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.   Indeed, Plaintiffs have been harmed by Defendants' conduct in numerous ways, including millions of dollars of payments that they would have not otherwise made and in the significant resources that have been devoted to identifying, tracking, and attempting to stop Defendants' fraudulent scheme.

25.     Personal Jurisdiction is proper in this Court because all Defendants are residents of Texas and/or maintain their principal places of business in Texas. Venue is appropriate in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because several Defendants reside

in this judicial district and pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

### Background

26.     United provides health insurance and/or administration of health plan benefits to insureds or plan participants (*i.e.*, members), pursuant to a variety of health care benefit plans and policies of insurance.

27.     United seeks to maintain a broad network of providers that offer members quality, affordable health care services.  Health care providers that are part of United's network are called "in-network" providers.   In-network providers enter into agreements with United that, among other things, govern the way that United will reimburse them for providing certain health care services to United's members.[3]   When a member receives in-network services, the member is only financially responsible for applicable cost-sharing amounts (*e.g.*, copays, deductibles, or coinsurance).[4]

28.     Providers that are not part of United's network are "out-of-network" providers. Some plans offer limited out-of-network benefits, while other plans do not offer any out-of-network benefits (except for certain emergency services).   Even when a plan offers out-of-network benefits, the member is likely to face significantly higher out-of-pocket costs for out-of-network services than they would if they had received in-network services.

29.     Providers submit claims for payment to United on industry-standard forms or, more frequently, the electronic equivalent of industry-standard forms.  The information included

---

[3]  Negotiated reimbursements  for health care services vary by provider.
[4]  An in-network provider may offer or provide services that are not part United's network, *i.e.*, a provider can be in-network for some services and facilities,  but out-of-network for other services or facilities.

in claims is material to United. Providers are required to submit accurate information in claims to United. Providers know that United relies on the accuracy of information in a claim form. By submitting a claim to United, a provider is affirming that the information in that claim is accurate and should be relied on by United.

### The Scheme to Defraud

30.     Dr. Murphy devised a scheme to defraud United through the submission of claims seeking payment for laboratory testing services that intentionally included false and misleading information and/or intentionally concealed or failed to disclose material information regarding the nature of the laboratory services listed therein.

31.     With the knowing and willful assistance of the other Defendants, Dr. Murphy executed his scheme to defraud United by submitting insurance claims that falsely represented that lab services were referred to and performed by in-network rural hospitals, so that United would pay for the services as though they were in-network services and subject to reimbursement under United's network participation agreements with those rural hospitals for inpatient and outpatient services.

32.     Broadly stated, Dr. Murphy, with Defendants' knowing participation and assistance, executes the fraudulent scheme by:

    a. inducing requests for lab services to Sun and Mission, including by (i) paying kickbacks to referral sources and (ii) falsely claiming to referral sources that Sun and Mission are part of United's network;

    b. establishing sham "lab programs" to launder claims for lab services —some of which were never ordered, never performed, were not ordered as performed, were

double-billed, and/or for which results were never provided—through rural hospitals;

c. paying other out-of-network labs to perform the lab services that were referred to Sun and Mission;

d. submitting claims to United using the rural hospitals' billing credentials; and

e. instructing the rural hospitals' employees to transfer the money the rural hospitals receive for lab services claims to IAM, Sun, Mission, and others.

33. As a result of this scheme, United was tricked into paying rural hospitals tens of millions of dollars for lab services that had no connection to and were not performed by those facilities. Many of the lab services were never ordered or authorized by a licensed physician. Even when lab services were ordered, referral sources were often paid to order them. Many of the lab services were technically unsound or duplicative, and some were never even performed at all. Each step of the fraudulent scheme is described in more detail below.

**A.    Dr. Murphy and Saucedo induce requests for lab services to Sun and Mission by (i) paying kickbacks to referral sources and (ii) falsely claiming to referral sources that Sun and Mission are part of United's network.**

34. Sales and marketing representatives working on behalf of Sun and Mission canvass the United States for referral sources who will refer patients' lab specimens to Sun and Mission for lab services.

35. Dr. Murphy and Saucedo direct sales representatives to target physicians who can refer patients with commercial insurance. They actively avoid referrals of patients with federally-funded plans because their practices violate federal laws that are applicable where federally-funded plans are at issue (*e.g.*, the False Claims Act, Stark Law, and Anti-Kickback Statute).

36.     Sun and Mission's sales representatives induce referrals from physicians and others who are in a position to guide referrals (*e.g.*, practice groups, addiction treatment facilities) by (i) offering payments in exchange for referrals (*i.e.*, kickbacks, disguised in various manners, such as distributions on sham investments or payments on sham contracts); and/or (ii) by falsely representing to referral sources that Sun and Mission's lab services are "in-network" with United (meaning patients would be responsible for far less out-of-pocket costs than if the lab services were out-of-network).

### i.    Kickbacks

37.     Kickbacks result in overutilization of medical services, increased costs, unfair competition, and adverse treatment determinations because medical providers are incentivized to make decisions based on profit rather than the best interests of their patients. This concern is heightened in the context of ancillary services, like lab services, because patients have little or no input in the services and they are often performed off-site, sometimes without patients ever realizing that services are even being performed.

38.     To conceal the source and purpose of the illegal kickbacks, money is funneled through Sun and Mission's affiliate entities to create artificial separation between the entity to which referrals are made (*e.g.*, Sun) and the entity from which payments are received (*e.g.*, Sun Clinical Laboratory LLC – Series 1).[5] The illegal kickback payments are further disguised by characterizing them as compensation for administrative, marketing, management, or consulting services, or as distributions on investments.  In reality, the payments are made in exchange for

---

[5] Dr. Murphy has established at least 29 "Series" limited liability companies, which are just shell companies that are used as conduits for kickbacks.  Dr. Murphy and Saucedo own or control a web of affiliated entities, including Saucedo Murphy Consulting, LLC, Mission Toxicology II, LLC, Mission Toxicology Management Company, LLC, Mission MSO Partners, LLC, Mission Allergy, LLC, Allergy Pro, LLC, Ancillary Healthcare Management, LLC, Clover Trail Capital, LLC, and New Leaf Investments, LLC, which may also be used to obfuscate relationships between conduct and payments and which may now possess the funds that were stolen from United.

referring patients' lab specimens to Sun or Mission. The more referrals that can be made, the larger the kickback payments. When referrals stopped, so did the kickbacks.

39.    The offers to pay, and payments of, money in connection with the performance of services for which claims for payment were submitted to United were intended to defraud and deceive insurers, like United, and constitute insurance fraud as defined in Texas Penal Code § 35.02(b).  Sun and Mission's use of kickbacks to induce referrals violates other Texas laws as well as the laws of many other states. *See, e.g.*, Tex. Occ. Code § 102.001.

40.    Sun and Mission's requisition forms effectively admit that Sun and Mission pay for referrals.  For example, their requisition forms include the following statement:

> In compliance with Section 102.006 of Texas Occupation Code, my referring physician has disclosed to me at the time of referral: (A) his, her or its affiliation with Sun Clinical Laboratory [Mission Toxicology] and (B) that he or she will receive, directly or indirectly, remuneration for referring me.[6]

41.    Many of United's members report that they never received these disclosures about their physicians' affiliation with Mission or Sun or that their physician was being paid, directly or indirectly, for referring their lab specimens to Sun or Mission.  Providers' claims do not include the requisition forms and United is never informed about the financial relationships between Sun or Mission and referral sources.

42.    Sun and Mission's sales representatives are paid commissions based on the number of referrals they procure and/or the money actually collected by Sun or Mission as a result of those referrals.  Sun and Mission instruct sales representatives to pressure referral sources into preselecting broad panels of lab services to be performed without any regard or

---

[6] This "disclosure" does not alter the otherwise illegal nature of the payments at issue here. Texas Occ. Code § 102.006 does not authorize payments that violate section 102.001; instead, it requires providers to disclose payment arrangements that do not violate section 102.001 because they satisfy a "safe harbor," under 42 U.S.C. § 1320a-7b(b). Sun and Mission's remuneration scheme does not fall within any of these safe harbors.

relationship to patients' clinical indications, history, or particular need so that United can be billed for more expensive services and more services per specimen.

43.     Upon information and belief, Sun and Mission disguise their kickbacks to referral sources as payments based on marketing or management contracts, or distributions on sham investments in Sun, Mission, and/or their affiliates, or through other arrangements with owners, managers, or employees in referral sources' offices, practices, or facilities.  This belief is based on the following facts: (a) the presence of the Tex. Occ. Code § 102.006 statement on the requisition forms; (b) kickbacks explain why referral sources across the country would request testing from Sun or Mission, Texas-based out-of-network labs; (c) kickbacks explain why physicians are willing to let Sun and Mission dictate that they request unnecessary services, such as reflexive confirmation testing performed on nearly all lab specimens; (d) sales pitches reportedly made by Mission and Sun representatives to physicians include the promise of money in exchange for referrals of lab specimens from patients with commercial insurance; (e) several Sun and Mission employees and executives were formerly employed by other out-of-network laboratories that relied on similar referrals-for-money models to sustain patient volume, including Megan Frazier, a founder of Mission Toxicology, Randy Ditmar, a Sun employee, and Amanda Feyrer, another Mission employee; (f) Dr. Murphy has created at least 29 "Series" Sun Clinical Laboratory LLCs and gathered more than 60 referral sources as investors in those "Sun Clinical Laboratory LLC – Series [1 – 29]" entities; (g) multiple postings on industry-specific forums identifying Sun and Mission as using "Series" LLCs to funnel kickbacks to investor-referral sources.

44. Additional information regarding kickbacks funneled through Sun and Mission and/or their known or unknown affiliates, is uniquely in the control and possession of Sun, Mission, their affiliates, executives, and the kickback recipients.

### ii. Falsely claiming to be part of United's Network

45. Neither Sun nor Mission is part of United's network of providers.

46. Physicians who are part of United's network are generally contractually required to use reasonable efforts to refer United members to other providers in United's network.

47. Physicians recognize that referring lab services to out-of-network providers may result in significant out-of-pocket costs for patients, which may result in patient complaints – to United, the referring physician's office, the lab, or even to governmental authorities. (*See, e.g.*, ¶¶ 96-98, below.)

48. Those complaints can damage physicians' reputations among patients, result in inquiries from United, or investigations by governmental authorities.

49. To convince physicians to refer United's members' lab specimens to Sun and Mission, sales representatives tell physicians that Sun and Mission are part of United's network.

### B. Dr. Murphy creates lab programs to launder lab services through rural hospitals.

50. Dr. Murphy targets small, rural hospitals that have network contracts with United and other commercial insurers. He presents a too-good-to-be-true opportunity to rehabilitate rural hospitals' finances with additional revenue and virtually no overhead, but actually seeks to use rural hospitals as conduits for his fraudulent scheme.

51. Dr. Murphy uses Sun, Mission, IAM, and their affiliates to create, control, and operate sham "lab programs" for rural hospitals.

52.     Defendants use the "lab programs" to make it seem like the rural hospitals were involved in the lab services so that there is a seemingly legitimate basis to bill United using the rural hospitals' credentials.  But there is none.

53.     No physician would legitimately request lab services from rural hospitals located hundreds or thousands of miles away that cannot even perform the requested services. Physicians have consistently reported to United that they have never heard of the rural hospitals submitting claims to United for lab services, despite the fact that the rural hospitals' claims identified those same physicians as the referring providers.  The physicians thought they were requesting lab services from Sun or Mission.

54.     Most lab specimens never went to the rural hospitals that billed United as though they performed lab services on the specimens.  Instead, lab specimens referred to Sun and Mission are sent to a central "sorting station," which is actually Dr. Murphy's warehouse, located at 1051 E. Nakoma Dr., San Antonio, TX 78216, which also houses IAM and AHL. When lab specimens did make it to a rural hospital, it generally was only after tests were performed by AHL and was done solely to attempt to cover up the scheme by making claims seem more legitimate if and when payors or investigating authorities sought records underlying the scheme or interviewed rural hospital employees.

C.      **Dr. Murphy pays other out-of-network labs to perform the lab services that were referred to Sun and Mission.**

55.     Although referring physicians refer patients' lab specimens to Sun or Mission for lab services, Sun or Mission do not actually perform the requested lab services.  Instead, Dr. Murphy and Saucedo have arrangements with other out-of-network labs to perform the lab services at volume-discount prices.

56.     Sun and Mission effectively broker lab testing to several out-of-network labs, such as Axis Diagnostics, Inc., Sonic Reference Laboratory, Inc., Clinical Pathology Laboratories, and Vantari Genetics.  However, Sun and Mission broker most lab services to AHL, which is managed and operated by LMK, which is owned and operated by Dr. Murphy and Saucedo.

57.     AHL is located in the same building as IAM, so using AHL to perform the lab services makes it easier for IAM to keep tabs on the related administrative, accounting, and billing activities and to keep the scheme hidden from United.

58.     A June 2016 agreement signed by Murphy, on behalf of AHL, and Saucedo, on behalf of Sun, contemplates Sun paying AHL $120 per specimen to perform both qualitative screening and quantitative confirmation testing and sending AHL up to 50,000 specimens per month.  The agreement, as well as public filings made by AHL's parent company, Alternate Health Corp., represent that the typical arm's length market rate for toxicology lab services is $120 per specimen. However, when IAM submitted claims to United seeking reimbursement for lab services that AHL performed for $120, the claims charged as much as 50 times that amount.

59.     Quantitative confirmation testing is not required or appropriate for every lab specimen, but Dr. Murphy and Saucedo included such testing in the agreed-to $120 per specimen price for *all* specimens because they intentionally caused claims for those services to be submitted just so that they could bill for them.

60.     The claims submitted to United for payment of lab services do not disclose that the referring physicians actually requested the lab services from Sun or Mission, that AHL actually performed the lab services, or the price that AHL was paid to perform the services. Instead, as described further herein, the claims falsely represent that the services were requested

from, and performed by, rural hospitals so that United would mistakenly believe that the services were in-network and would pay for the services pursuant to its contracts with the rural hospitals.

**D.**     **IAM submits claims to United using rural hospitals' billing credentials.**

61.     IAM is the administrative hub for the scheme to defraud United. IAM is located in the same warehouse as AHL.

62.     IAM acted as the rural hospitals' billing agent, which allowed Defendants to use the rural hospitals' billing credentials to submit claims for lab services to United and trick United into paying for the lab services as though they were in-network services referred to and performed by the rural hospitals. IAM also purportedly leased office space and employees to rural hospitals to facilitate the rural hospitals' lab programs. But these arrangements were a sham and were only created to further obfuscate the scheme.

63.     IAM maintained a laboratory information system that tracked where testing specimens were referred from (or who they were referred by), whether specimens were referred to Mission or Sun, and where testing was actually performed. IAM maintained a billing system that tracked how claims were submitted to United (*i.e.*, under which hospital's billing credentials), what payment was received as a result of each claim, whether Sun or Mission received credit for the payment, and calculated the amounts that Defendants later instructed the rural hospitals' employees to transfer to IAM, Sun, and Mission.

64.     IAM intentionally submitted claims for lab services to United that falsely represented that the physicians identified in the claims referred United's members' lab specimens to rural hospitals for lab services and that the rural hospitals performed the lab services at their facilities. Even where a medical provider technically referred a patient's specimen to a rural hospital for testing, the referral was illegitimate and only made for the personal financial gain of

the medical provider making the referral, but IAM concealed and/or failed to disclose this to United when it submitted claims, despite having a duty to do so.

65.     By billing lab services as though they were referred to and performed by one of the rural hospitals, which are part of United's network of providers, Defendants were able to: (a) circumvent the measures put in place by United to detect improper conduct from out-of-network providers; (b) receive reimbursements from United plans that do not cover out-of-network laboratory services; (c) receive reimbursements at the higher co-insurance percentage for in-network services, rather than the lower co-insurance percentage for out-of-network services for many plans; (d) receive reimbursements at terms negotiated between United and rural hospitals, which were based on the hospitals' low patient volume and importance to ensuring United's members in underserved areas have access to quality health care services; and (e) limit complaints from United's members about receiving explanations of benefits (EOBs) showing that they owe significant sums for out-of-network services (or bills showing the same).

66.     Once United or other payors realized that they were receiving fraudulent claims from a rural hospital and stopped issuing reimbursements to that rural hospital or when a rural hospital's employees refused to continue transferring money to Defendants, IAM just submitted claims under a different rural hospital's billing credentials.

67.     IAM managed patient billing responsibilities for claims that were part of the rural hospitals' "lab programs." IAM routinely ignored collecting patients' copays, coinsurance, and deductible amounts.[7] Even when IAM would send patients a bill for such amounts, they would not actually attempt to collect the amounts if patients did not pay the first bill.

---

[7] It is a violation of Tex. Ins. Code § 1204.055 to waive deductibles or copayments.

68. IAM was actively engaged in covering up the scheme. IAM forged lab reports to make it appear that a rural hospital performed lab services that were actually performed in the same warehouse as IAM's offices, by AHL. For example, below are two lab reports for the same patient and specimen.[8] IAM removed AHL's information and pasted Newman Memorial Hospital's information onto the top of the lab report that is transmitted to referring physicians to make it appear as though services were performed by and at Newman Memorial Hospital. Many lab reports list the wrong CLIA information in the top right corner.



Laboratory Report

Laboratory Director Andrew Klippenberger, PhD
CLIA Number: 45D2107927
1051 E NAKOMA DRIVE
SAN ANTONIO, TX 78216
210 318-3255

**Clinic Information**
Client: mission2

Requesting Physician / Practitioner:
HL7, Physician

Prescribed Medications: Adderall

**Patient Information**
Patient Name:
Patient ID:
Date of Birth:
Male/Female:

**Sample Information**
Lab Sample ID:
Specimen Type: Urine
Collected:
Received:
Reported:

**CONFIRMATION RESULT SUMMARY**

| CONSISTENT: | Prescribed - Detected | Result | Cutoff |
| --- | --- | --- | --- |
| d/l-Amphetamine | | Positive | <100 ng/mL |

| INCONSISTENT: | Prescribed - Not Detected | Result | Cutoff |
| --- | --- | --- | --- |
| None | | None | |

| INCONSISTENT: | Not Prescribed - Detected | Result | Cutoff |
| --- | --- | --- | --- |
| None | | None | |

---

[8] IAM did not provide this information to United when IAM submitted claims or caused claims to be submitted.

## Newman MEMORIAL HOSPITAL
### ✚ & St. Anthony Hospital Affiliate

## Laboratory Report

**Clinic Information**

Client:

Requesting Physician / Practitioner:

**Patient Information**

Patient Name:
Patient ID:
Date of Birth:
Male/Female:

**Sample Information**

Lab Sample ID:
Specimen Type: Urine
Collected:
Received:
Reported:

Prescribed Medications: Adderall

### CONFIRMATION RESULT SUMMARY

| CONSISTENT: | Prescribed - Detected | Result | Cutoff |
|---|---|---|---|
| d/l-Amphetamine | | Positive | <100 ng/mL |

| INCONSISTENT: | Prescribed - Not Detected | Result | Cutoff |
|---|---|---|---|
| None | | None | |

| INCONSISTENT: | Not Prescribed - Detected | Result | Cutoff |
|---|---|---|---|
| None | | None | |

69.    When a Sun or Mission requisition form arrived at IAM with a lab specimen, IAM placed a sticker with a rural hospital's name on it on the top of the form so that it would appear that the request was made to the rural hospital that billed United for the services.  For example, below is a Mission requisition form that had a Newman Memorial Hospital sticker placed on it.



70.     Although Defendants did not legitimately attempt to hold members responsible for copays, deductibles, or coinsurance, they still sometimes sent patients a single bill to feign compliance with their legal obligations. When patients received a bill or EOB that contained charges from a rural hospital they had never been to and had never heard of, they often would try to investigate or complain. To avoid rural hospitals' employees catching on to the scheme, IAM sent out bills and statements with its own phone number listed instead of the rural hospitals' phone numbers.

71.     The rural hospitals referred billing complaints to Dr. Murphy, but he passed the issues on to his daughter, Samantha Murphy, a manager at IAM, to handle. She offered various misleading explanations and generally tried to dissuade patients from contacting authorities regarding the lab services and billing practices.

72.     The rural hospitals received information and direction from attorneys associated with IAM and Dr. Murphy regarding how to bill for services that were not performed by the rural hospitals and which were performed on specimens obtained from patients who had no other relation to the rural hospitals. These attorneys did not maintain attorney-client relationships with the rural hospitals, but were used to make rural hospitals comfortable with the suspicious billing arrangements.

**E.      Defendants instruct the rural hospitals' employees to transfer the money received for lab services claims to IAM, Sun, Mission, and others.**

73.     Because IAM billed lab services to United using rural hospitals' billing credentials, United issued payments to the rural hospitals.[9]

---

[9] For fully-insured and self-funded plans, United adjudicates claims and then makes benefit payments. United maintains administrative services agreements with self-funded plans, which, except for in certain, limited circumstances, vest United with the authority, responsibility, and discretion to pursue overpayments, fraud, waste, and abuse, on the plans' behalf.

74.	After United made payments to the rural hospitals for lab services claims, Individual Defendants directed the rural hospitals' employees to wire the majority of the funds to Sun, Mission, IAM, and their affiliates.

75.	Defendants used the rural hospitals' lab programs as the bases for their instructions to make large transfers of money to Sun, Mission, IAM, and other affiliates.

76.	Generally, IAM took 5% of the gross amount received through a lab program, and charged the rural hospitals (a) rent for leasing space in IAM's office inside of Murphy's San Antonio warehouse, (b) wages to pay the employees who were purportedly "leased" to the rural hospitals, and (c) for laboratory testing supplies (utilized by AHL to actually perform the services).

77.	After those payments were made to IAM, the remaining money was considered "net revenue." Generally, Sun and Mission received 75% of "net revenue." Sun and Mission divided their 75% of "net revenue" based on the respective percentage of reimbursements for specimens attributed to each entity.

### Executing the Fraudulent Scheme

78.	Defendants have used *at least* two different rural hospitals to execute this fraudulent scheme: (A) Newman Memorial Hospital; and (B) Community Memorial Hospital. It is likely that Defendants have used other rural hospitals to execute similar schemes and that those rural hospitals will be identified during discovery.

### A.	Newman Memorial Hospital

79.	Newman Memorial Hospital ("NMH") is a small, rural hospital, located in Shattuck, Oklahoma. NMH has a contract that governs its participation in United's network.

Pursuant to that contract, and subject to various other conditions, United reimburses NMH for services that NMH performs at its location in Shattuck, Oklahoma.

80.     Dr. Murphy and Saucedo, on behalf of Sun, SAM, Mission, and IAM, signed a number of agreements with NMH, which purported to establish a "lab program." Dr. Murphy, on behalf of SAM and Mission, signed another reference lab agreement that purported to give control and management over the lab program to SAM and Mission. Saucedo, on behalf of Mission, signed a reference lab agreement that purported to give Mission operational control and management over lab specimens being referred to NMH or from NMH to other labs. Dr. Murphy, on behalf of IAM, signed a master billing agreement, which gave IAM control of NMH's billing operations, a sublease agreement, which purportedly gave NMH space in IAM's San Antonio warehouse, and an employee leasing agreement, which purported to lease six employees to NMH.

81.     The "lab program" gave Dr. Murphy expansive control over the management and operation of NMH's affairs, including the submission of misleading claims to United, billing patients, and distributing funds United paid to NMH. The other individual Defendants participated in the management of NMH's affairs by actually determining which "patients'" specimens should be referred to NMH, which claims should be submitted under NMH's information, how NMH billed for the lab services, and directing NMH employees to make specific accounting and financial transactions.

82.     Dr. Murphy and the other Defendants caused the submission of thousands of claims to United with the intent to defraud United through false and fraudulent representations regarding the nature of the services listed in the claims. By using NMH's billing credentials to submit claims for lab services that were not actually referred to NMH and that NMH did not

actually perform, they intended to trick United into paying for those lab services as though they were in-network services performed at NMH.

83.　　NMH was not even able to perform the majority of lab services that were purportedly referred to it.　NMH could not perform quantitative toxicology testing; however, Defendants used NMH's billing credentials to submit thousands of claims for such services, causing United to pay NMH approximately $7.8 million for such lab services (procedure codes G0480, G0481, G0482, G0483). NMH could not perform allergy testing; however, Defendants used NMH's billing credentials to submit hundreds of claims for such services, causing United to pay NMH approximately $1.1 million for such lab services (procedure code 86003). These claims did not contain the appropriate coding to indicate that the services were performed by another provider because the claims were intended to mislead United about the nature of the listed services.

84.　　At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit thousands of claims to United that falsely represented, among other things, that the lab services listed in the claims were referred to and performed by NMH, at 905 S. Main Street, Shattuck, OK 73858.　In reality, the lab services were actually referred to Sun or Mission (not NMH) and were actually performed by out-of-network labs, generally in Texas (not by NMH in Oklahoma).　**Exhibit A** lists representative examples of claims that contained these material misrepresentations.[10]

---

[10]　Exhibits attached to this Complaint contain representative examples of fraudulent claims. Each claim is identified by the date it was submitted to United; the rural hospital listed as the provider of the services; the rural hospital's address that was listed as the place the services were performed; and the amount charged in the claim. To preserve members' privacy, the Exhibits do not include any personally identifiable information (PII) or personal health information (PHI). To the extent that Defendants need such information and are unable to derive it from their own records, then United will produce additional information for each claim, including the claim-specific patient account number utilized by Defendants, upon the entry of a Qualified Protective Order.

85.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit claims that intentionally misrepresented information about the lab services that *were* actually rendered at NMH. After breaking ties with Defendants, NMH informed United that the toxicology lab services that *were* actually performed at NMH were screening tests performed on specimens that already had quantitative testing performed on them by AHL. This testing is "backwards." Claims submitted to United for lab services that list "presumptive" (*i.e.*, screening) and "definitive" (*i.e.*, confirmation) testing procedure codes when the quantitative test (to definitively identify a specific amount of a substance) was performed before the qualitative test (to evaluate whether the substance is present), misrepresent the services that were rendered. **Exhibit B** lists examples of claims that contained this type of material misrepresentation.

86.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit claims for services that were never requested or authorized to be performed. **Exhibit C** lists examples of claims that contained this type of material misrepresentation.

87.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit claims for services that had already been billed to United using a different rural hospital's billing credentials. For example, IAM submitted tens of thousands of dollars of claims for the same member, the same service, and the same date of service under both NMH's *and* Community Memorial Hospital's billing credentials. **Exhibit D** lists specific examples of such double-billed, fraudulent claims.

88.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit claims for services that were never performed at

all, or where the results of the services were never received by the referring provider. **Exhibit E** lists examples of such fraudulent claims.

89.    At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used NMH's billing credentials to submit claims that failed to disclose that the services listed therein were induced by illegal kickbacks, despite having a duty to do so. **Exhibit F** lists examples of such fraudulent claims.

90.    Below are additional representative examples of specific fraudulent claims Defendants submitted or caused to be submitted to United. Particular details relating to each underlying claim are listed in **Exhibit G**:

   a. **Backwards testing.** During an on-site inspection by United's Special Investigations Unit (SIU), an NMH employee admitted that all toxicology testing samples for which NMH billed United were first sent to Dr. Murphy's warehouse in San Antonio for quantitative testing and then were sent to NMH for the qualitative (screening) tests.

   b. **Copay waiver.** A United member in Florida reported to United that she had lab work drawn at her doctor's office and was told at the visit that she would not be charged because "there was an agreement with the doctor and Newman."

   c. **Testing without member consent.** A United member contacted United after receiving an Explanation of Benefits that listed NMH in Oklahoma as the provider for almost $10,000 of lab claims following a wellness visit with her Texas health care provider. The member stated that she would never have agreed to have such a large amount of testing that resulted in such a large bill.

   d. **Double billing.** Two claims – each for the same testing on the same date of service for the same member – were submitted to United using NMH's identification. One listed the referring provider as Mission Toxicology and the other claimed the member's doctor was the referring provider.

   e. **Member complaints about "gouging."** A United member complained to NMH about receiving a bill for over $1,700. NMH notified Samantha Murphy of the complaint, explaining that the member "is a business owner and does drug testing on employees and knows the cost" and "states that we are gouging him and the insurance company." The NMH employee then asked "IS [sic] this billing correct for him going to pain clinic and getting his monthly check? $1,700??"

   f. **No record of order or results.** United was charged for testing in claims submitted with NMH's credentials. When United requested copies of the

underlying medical records, including the physician's orders for laboratory testing and testing results, from the physician listed as the referring provider in those claims, the physician denied having any records for the patient.

g. **Billing for testing not performed.** NMH's identification was used to bill United for testing where medical records later revealed that the testing was not performed because the specimen was clotted. While the medical records state that the "charges [were] deleted," a claim was submitted and United paid the claim. More importantly, the United member did not receive results for the testing that her physician ordered. Although that routine test can be performed in nearly every lab, Defendants routed her specimen from Dallas to Austin.

h. **Billing for testing not done by NMH.** During July 2017, a physician collected a blood specimen from a United member and requested that Sun perform a "complete wellness panel." On July 22, 2017, IAM submitted a claim to United that falsely represented that NMH performed 29 separate procedure codes. United relied on the information supplied in the claim and paid NMH. The patient's specimen, however, never left Texas; the blood testing was performed by AHL in San Antonio, not at NMH in Oklahoma.

i. **Billing for testing not done by NMH and physician incentives.** During December 2016, a physician who owns a portion of a "Series" LLC created by Dr. Murphy collected a urine specimen from a patient and requested qualitative screening and quantitative confirmation testing from Sun. On March 16, 2017, IAM submitted a claim to United that falsely represented that NMH performed a presumptive qualitative screen (procedure code G0479) and a definitive quantitative confirmation test (procedure code G0480). These procedure codes misrepresented the services performed, NMH did not perform the services, and the claim failed to disclose that the referring provider requested the services because of a personal financial interest.

91.     In sum, from May 27, 2016 through September 30, 2017, United paid NMH at least $22 million for lab services based on the fraudulent claims Defendants submitted or caused to be submitted to United.

92.     Because United paid NMH for the claims Defendants submitted under NMH's billing credentials, Individual Defendants directed NMH employees to make wire transfers totaling tens of millions of dollars to Entity Defendants. These transfers were made in furtherance of, and were essential to the success of, the scheme to defraud.

93.     For example, on August 2, 2016, Samantha Murphy instructed NMH employees to wire $83,151.29 to Sun and $107,621.48 to Mission. On August 15, 2016, Samantha Murphy instructed NMH employees to wire $231,121.97 to Sun and $203,891.16 to Mission. On August 31, 2016, Julie Pricer instructed NMH employees to wire $120,742.73 to Sun and $103,734.74 to Mission.   On October 4, 2016, Dr. Murphy instructed Julie Pricer to request NMH employees to send $1,384,339.02 to Sun and Mission ($520,428.97 to Mission and $863,910.05 to Sun).

94.     On May 31, 2016, Julie Pricer invoiced NMH $6,725.90 for a "sublease" from IAM in Dr. Murphy's San Antonio warehouse.   On June 30, 2016, Julie Pricer invoiced NMH $17,266.08 for employees "subleased" from IAM, who purportedly worked for NMH in Dr. Murphy's San Antonio warehouse.   When Pricer submitted these invoices at Dr. Murphy's direction, she knew that multiple hospital facilities were being billed for the same office space and for the same employees' time.

95.     When IAM employees and NMH employees could not agree on the amounts NMH should transfer to IAM, Sun, or Mission, Samantha Murphy was added to communications so that she could direct specific amounts to be transferred and the dates when the transfers needed to occur.   NMH employees would verify the amounts they were going to transfer with Samantha Murphy before going through with the transactions.   Samantha Murphy would sometimes loop in Dr. Murphy or Saucedo (at their personal email addresses) to make final determinations.

96.     Dr. Murphy's control and authority over NMH included handling complaints and concerns from patients who were caught up in the scheme.   NMH C.F.O. Bruce Mogel deferred to Dr. Murphy when NMH was confronted with legal threats and allegations of fraudulent billing relating to the operation of NMH's "lab program."



Elizabeth Speligene <████@newmanmemorialhospital.org>          Wed, Sep 21, 2016 at 12:08 PM
To: ████<bmogel@peopleschoicehospital.com>, dwanger <████@peopleschoicehospital.com>

Good afternoon,

We received a complaint from Pt ████ DOS ████ for drug screening.

████ spoke to Jennifer Johnson and then called Newman to advise us ████ is filing a lawsuit, Informing the VA of fraudulent billing and calling channel 6 news to investigate.

████ stated that we committed a misdemeanor and it would be a felony if ████ insurance would have paid. ████ sates that there is falsification of documentation.

████ stated the results for ████ drug testing were not even correct. ████ said ████ would have to smoke 14 packs of cigs a day and drink 22 beers in 4 hours to meet the results.

--

Thank You,

*E. Speligene*

Elizabeth Speligene, RCM

Newman Memorial Hospital

---

Bruce Mogel <████@peopleschoicehospital.com>                Wed, Sep 21, 2016 at 12:33 PM
To: Elizabeth Speligene <████@newmanmemorialhospital.org>
Cc: Seth Guterman <████@peopleschoicehospital.com>

Please forward to Dr. Murphy

97.     NMH C.E.O. David Wanger also deferred to Dr. Murphy regarding such complaints.

---

Rhonda Hayes <████ newmanmemorialhospital.org>             Mon, May 15, 2017 at 3:20 PM
To: David Wanger <████@gmail.com>, Elizabeth Speligene <████@newmanmemorialhospital.org>

This ████ left a message on my voicemail on Friday. ████ is the CFO of two companies in ████ and also a Consultant with a Medical Practice in ████ that has experienced some Medical Fraud. ████ believes that we have received some of their money. Can someone please call ████ regarding this issue as soon as possible?

--

Rhonda Hayes| Newman Memorial Hospital | Administrative Assistant
905 S Main St | Shattuck, OK  73858          ████ Fax ████
newmanmemorialhospital.org

---

david wanger <████@gmail.com>                              Mon, May 15, 2017 at 3:23 PM
To: Elizabeth Speligene <████ newmanmemorialhospital.org>

this goes to dr murphy.

D

98.     Dr. Murphy relied on his daughter, Samantha Murphy, and others at IAM to handle these complaints and concerns and instructed them to respond in a way that would not draw additional attention to the fraudulent scheme.   NMH employees could not handle these complaints, because IAM kept all the information about the "lab program's" patients, since the patients had never been to, or even heard of, NMH.   Documents that patients received that were purportedly from NMH listed IAM's contact information.

99.     NMH ultimately became suspicious of Dr. Murphy and the rest of the Defendants and sought to rescind its agreements with Sun, Mission, SAM, IAM, and other Dr. Murphy or Saucedo affiliates.

100.     On June 30, 2017 NMH filed suit against the former management company, Sun, Mission, IAM, and others in Oklahoma state court.   A second amended petition was filed on August 7, 2017.   In that lawsuit, NMH alleges that Sun, Mission, and IAM, among others, "took advantage of [NMH's] in-network contracting provisions with private payors"; "submitted claims to private payors under [NMH's] national provider identification number for laboratory tests in violation of [NMH's] provider agreements with payors"; and otherwise left NMH in complete disarray.   *See Shattuck Hosp. Auth., et al. v. Mission Toxicology, et al.*, Case No. CJ-2017-14, District Court of Ellis County, Oklahoma, Second Amended Pet. (Aug. 7, 2017).

101.     Nevertheless, Defendants continued to use NMH's billing information to submit fraudulent claims to United through at least August 2017.   United has expended significant resources attempting to identify and differentiate between legitimate claims from NMH and fraudulent claims disguised by NMH's information.

### B. Community Memorial Hospital

102. Community Memorial Hospital ("CMH") is a small rural hospital located near the Indiana/Ohio border, in Hicksville, Ohio. It has a network agreement with United.

103. CMH was approached by a third party about establishing a "lab program" that would help Mission handle an "overflow" of lab specimens by processing and testing the specimens.

104. On September 23, 2016, Dr. Murphy executed a number of agreements with CMH, which, together, purported to create a "lab program" for CMH. CMH entered into an agreement with SAM and Mission. Dr. Murphy executed this agreement on behalf of SAM and Mission, as their "Managing Partner." CMH entered into an agreement with IAM, which gave IAM control over CMH's billing operations and purported to establish a satellite office in IAM's San Antonio office. The satellite office was purportedly staffed with the same individuals who were "leased" to NMH and was in the same space as that which was purportedly leased to NMH. Dr. Murphy executed the agreement on behalf of IAM, as its "Manager."

105. Samantha Murphy was CMH's main point of contact for Sun, SAM, Mission, and IAM. She handled patient complaints, billing questions, and instructed CMH employees to transfer millions of dollars from CMH to Sun, Mission, and IAM.

106. Dr. Murphy and the other Defendants caused the submission of thousands of claims to United with the intent to defraud United through false and fraudulent representations regarding the nature of the services listed in the claims. By using CMH's billing credentials to submit claims for lab services that were not actually referred to CMH and that CMH did not actually perform, they intended to trick United into paying for those lab services as though they were in-network services.

107. CMH was not even able to perform the majority of lab services that were purportedly referred to it. CMH could not perform quantitative toxicology testing; however, Defendants used CMH's billing credentials to submit thousands of claims for such services, causing United to pay CMH approximately $8.9 million for such lab services (procedure codes G0480, G0481, G0482, G0483). CMH could not perform allergy testing; however, Defendants used CMH's billing credentials to submit thousands of claims for such services, causing United to pay CMH approximately $1.2 million for such lab services (procedure code 86003).

108. At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used CMH's billing credentials to submit thousands of claims to United that falsely represented, among other things, that the lab services listed in the claims were referred to and performed by CMH, at 208 N. Columbus St., Hicksville, OH 43526. However, in reality, the lab services were actually referred to Sun or Mission (not CMH) and were actually performed by out-of-network labs, generally in Texas (not by CMH in Ohio). **Exhibit H** lists representative examples of claims that contained these material misrepresentations.

109. At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used CMH's billing credentials to submit claims for services that were never requested or authorized to be performed. **Exhibit I** lists representative examples of claims that contained these material misrepresentations.

110. At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used CMH's billing credentials to submit claims for services that had already been billed to United under a different rural hospital's billing credentials. As noted above and identified in **Exhibit D**, IAM submitted tens of thousands of dollars of duplicate claims under both NMH _and_ CMH's billing credentials.

111.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used CMH's billing credentials to submit claims for services that were never performed at all.  **Exhibit J** lists representative examples of claims that contained these material misrepresentations.

112.     At Individual Defendants' direction, and in furtherance of the scheme to defraud, IAM used CMH's billing credentials to submit claims that failed to disclose that the services listed therein were induced by illegal kickbacks, despite having a duty to do so.  **Exhibit K** lists examples of such fraudulent claims.

113.     Below are additional representative examples of specific fraudulent claims Defendants submitted or caused to be submitted to United. Particular details relating to each underlying claim are listed in **Exhibit L**:

a.   **Billing for testing not done by CMH.** On eight dates in March and April 2017 (March 21, March 22, March 23, March 29, April 8, April 12, April 21 and April 22), IAM submitted claims to United that falsely represented a Huntington Beach physician referred a member's specimens to CMH and that CMH performed the lab services in rural Ohio.  However, the specimens were not referred to CMH and CMH did not perform any of the lab services.  Relying on the false representations in the claims, United paid CMH.

b.   **No documentation of order or results for testing.** CMH billed United over $3,500 for testing allegedly performed for one United member in Texas on one date. United asked CMH to provide the medical record documentation for the testing. CMH's submission of documentation failed to include a physician order for the tests.  It also failed to include any test results. The only "documentation" provided was billing information.

c.   **No documentation of order for testing.** United requested medical record documentation for lab testing billed by CMH.  The records provided did not include a physician order for any tests. The submitted records included only a summary that stated "lab values attached" and a note written by a physician that did not mention ordering any labs but did document a medication prescription (as requested by the member). CMH billed United for more than 75 tests, including allergy tests where the test results were listed as "pending."

d. **No documentation of order for testing.** Medical records submitted in response to United's request for documentation of testing billed by CMH included a physician visit for "an upcoming knee surgery" that does not indicate that any lab testing was ordered. But toxicology testing for more than 45 substances – including cocaine, methamphetamine, and PCP (all of were reported as "not detected") – was performed and billed to United.

e. **Billing for testing not done by CMH.** On March 13, 2017, a physician collected a urine sample in Huntington Beach, California and requested that it be tested by Mission Toxicology. However, Axis Diagnostics, Inc. actually performed the lab services. IAM submitted a claim to United for the lab services on March 23, 2017, which falsely represented that the member's lab specimen was referred to CMH and that CMH performed the lab services in rural Ohio.

f. **Discrepancies in test result reporting.** CMH provided laboratory testing results for a United member that purported to show that some of the lab tests were "Performed by Quest Diagnostics." The version of the laboratory testing results provided by the member's medical provider are different. They do not indicate that testing was performed by Quest Diagnostics and specifically state "Unless otherwise indicated, testing performed by [AHL]." These differences call into question the accuracy and validity of the reporting, whether the testing was performed, and whether it was performed by a provider with appropriate licensure for that testing.

g. **Billing for testing not done by CMH.** IAM submitted a claim to United on January 23, 2017, which falsely represented that CMH performed an allergy test. The claim billed for 66 units of CPT code 86003. CMH did not perform the services – Arrayit Corporation, in Sunnyvale, California, did. United, relying on the fraudulent claim, paid CMH for these services. After United paid CMH for the testing services, United received copies of the underlying medical records and then contacted the physician who allegedly requested the testing. The physician represented that that she requested the testing from Sun and that she had never heard of CMH.

114. In sum, from November 1, 2016 through October 31, 2017, United paid CMH at least $22 million for lab services. Most, if not all, of the payments were based on fraudulent claims, submitted by or caused to be submitted by Defendants in furtherance of the scheme to use CMH to defraud United.

115. Because United paid CMH for the claims submitted under CMH's billing credentials, Individual Defendants directed CMH employees to make wire transfers totaling tens

of millions of dollars to Entity Defendants. These transfers were made in furtherance of, and were essential to the success of, the scheme to defraud.

116. CMH paid IAM 5% of revenue from the reference lab program and also paid IAM for other costs, including those purportedly associated with leasing and staffing CMH's satellite" office in San Antonio. Sun and Mission received approximately 60% of the remaining amount, which they split up based on which entity was credited with the specimen. Sun and Mission divided their 60% based on the respective percentage of reimbursements for specimens attributed to each entity.

117. Julie Pricer instructed CMH employees to transfer at least $19,561,005.30 to Mission and $7,060,089.91 to Sun. Examples of such fraudulent transfers are listed below:

| Recipient | Date Requested | Amount | | Recipient | Date Requested | Amount |
|---|---|---|---|---|---|---|
| Sun | 2/28/2017 | $453,082.36 | | Mission | 2/28/2017 | $1,130,038.55 |
| Sun | 2/3/2017 | $34,717.35 | | Mission | 2/3/2017 | $112,400.56 |
| Sun | 2/20/2017 | $106,246.36 | | Mission | 2/20/2017 | $294,655.67 |
| Sun | 2/23/2017 | $87,000.00 | | Mission | 2/23/2017 | $532,585.82 |
| Sun | 3/8/2017 | $152,069.11 | | Mission | 3/8/2017 | $302,192.59 |
| Sun | 3/10/2017 | $323,813.74 | | Mission | 3/10/2017 | $688,304.28 |
| Sun | 3/21/2017 | $136,055.68 | | Mission | 3/21/2017 | $220,603.64 |
| Sun | 3/28/2017 | $371,525.56 | | Mission | 3/28/2017 | $990,645.74 |
| Sun | 4/4/2017 | $364,566.49 | | Mission | 4/4/2017 | $880,019.48 |
| Sun | 4/10/2017 | $627,572.56 | | Mission | 4/10/2017 | $1,726,053.00 |
| Sun | 4/19/2017 | $692,486.32 | | Mission | 4/14/2017 | $2,078,538.00 |
| Sun | 4/26/2017 | $862,184.85 | | Mission | 4/26/2017 | $2,298,210.30 |
| Sun | 5/1/2017 | $675,021.44 | | Mission | 5/1/2017 | $2,286,222.03 |
| Sun | 5/11/2017 | $609,093.70 | | Mission | 5/11/2017 | $1,696,676.18 |
| Sun | 6/5/2017 | $281,654.80 | | Mission | 6/5/2017 | $664,559.16 |
| Sun | 6/7/2017 | $272,373.49 | | Mission | 6/7/2017 | $731,276.60 |
| Sun | 6/13/2017 | $219,793.60 | | Mission | 6/13/2017 | $629,316.62 |
| Sun | 6/23/2017 | $272,415.65 | | Mission | 6/23/2017 | $819,999.89 |
| Sun | 6/29/2017 | $111,478.41 | | Mission | 6/29/2017 | $278,424.68 |
| Sun | 7/6/2017 | $117,693.70 | | Mission | 7/6/2017 | $459,284.11 |
| Sun | 7/13/2017 | $289,244.74 | | Mission | 7/13/2017 | $740,998.40 |

## INFORMATION UNIQUELY IN DEFENDANTS' POSSESSION

118.    Because United only receives information contained in a claim, some information underlying this scheme is not in its possession and is, instead, uniquely and intentionally only in Defendants and other known and yet unknown coconspirators' possession.  For example, information reflecting payments made to referral sources is uniquely in the possession of the parties involved in those transactions.  The underlying requisition forms and medical records are generally not in United's possession.

## THEORIES OF ATTRIBUTION OF LIABILITY

119.    Assisting and Participating. IAM accomplished a tort through its intentional and knowing submission of false and misleading material information to United. The actions of Sun, Mission, SAM, LMK, AHL, Dr. Murphy, Saucedo, Lynn Murphy, Samantha Murphy, and Julie Pricer provided substantial assistance in accomplishing the tortious result. The assistance provided by each of these Defendants was a substantial factor in causing the tortious result. Therefore, each of these Defendants are jointly and severally liable for IAM's tortious conduct.

120.    Veil Piercing. The corporate form of Sun, SAM, Mission, IAM, LMK, and AHL should be disregarded because these forms: (1) were used as shams to perpetrate a fraud; (2) were organized and operated as a mere tool and business conduit, and are alter egos; (3) were used to evade existing legal obligations. Dr. Murphy, Saucedo, Lynn Murphy, Samantha Murphy, and Julie Pricer caused these entities to be used for the purpose of perpetrating an actual fraud upon United, which was committed primarily for the benefit of Dr. Murphy, Saucedo, Lynn Murphy, Samantha Murphy, and Julie Pricer. Therefore, Individual Defendants are vicariously, jointly, and severally liable.

121.     Assisting or Encouraging. IAM committed conduct constituting a tort. Sun, Mission, SAM, LMK, AHL, Dr. Murphy, Saucedo, Lynn Murphy, Samantha Murphy, and Julie Pricer each had knowledge that such conduct constituted a tort and gave IAM and each other assistance and/or encouragement, which was a substantial factor in causing the tort. Therefore, Sun, Mission, SAM, LMK, AHL, Dr. Murphy, Saucedo, Lynn Murphy, Samantha Murphy, and Julie Pricer are jointly and severally liable.

122.     Alter Ego. Additionally, or in the alternative, Individual Defendants, as IAM's alter egos, are jointly and severally liable for IAM's tortious conduct. Individual Defendants have complete control and domination over IAM and knowingly use IAM as a mere instrumentality to perpetrate fraud for their personal benefit. They have a unity of interest with IAM. United will suffer an injustice because, while IAM committed the fraudulent acts, the nature of the scheme is such that the money taken from United as a result of those fraudulent acts goes, directly or indirectly, predominantly to Individual Defendants.  By adhering to IAM's corporate form to limit the liability for IAM's fraudulent acts, United will suffer an injustice.

123.     Aiding and Abetting. Additionally, or in the alternative, the other Defendants aided and abetted IAM's fraudulent submissions and are each jointly and severally liable for the harm caused by IAM's wrongful conduct.  The other Defendants knew about IAM's fraudulent submissions and knew about their own role in assisting IAM commit fraud.   The other Defendants knowingly, intentionally, and substantially assisted in IAM's fraudulent claim submissions as described herein.   The fraudulent conduct that the other Defendants aided and abetted constitutes deviant and antisocial behavior, which poses risks of certain harm to a large number of people, including all participants in interstate healthcare markets.

124. Conspiracy. Each Defendant agreed to accomplish an unlawful objective – to obtain funds from United to which they are not entitled – and to accomplish that object via a course of action including unlawful means – submitting fraudulent and misleading claims to United. As alleged herein, each of these Defendants took overt actions in furtherance of the conspiracy. This conspiracy resulted in thousands of unlawful acts, including each of the specifically identified fraudulent claims in **Exhibits A - L** and fraudulent transfers identified herein, and caused the tortious interference with United's contracts with NMH and CMH. United has been harmed in excess of $40 million as a result of these unlawful acts performed in pursuit of this conspiracy. Each conspirator is jointly and severally liable for these unlawful acts.

125. Single Business Enterprise. Additionally, or in the alternative, Entity Defendants are jointly liable for the harm United has suffered as a result of IAM's fraudulent claim submissions because they constitute a single business enterprise that pooled resources to achieve the common purpose of defrauding United and other private payors.

## CAUSES OF ACTION

### Count One

### FRAUD AND FRAUDULENT NONDISCLOSURE

### (Against all Defendants)

126. Paragraphs 1 through 125 are incorporated herein.

127. Beginning in early 2016 and continuing through at least August 2017, Defendants caused and instructed IAM to submit thousands of insurance claims to United, purportedly on behalf of NMH and CMH that contained various material misrepresentations and/or concealed or failed to disclose material information.

128.     The identity of the provider that performs health care services billed to United is material information to United.  The location of the performance of the health care services billed to United is material information to United.  The identity of the provider to whom patients or patients' specimens are referred to is material information to United.  Whether health care services billed to United have actually been requested to be performed by a licensed medical provider is material information to United.  Whether health care services billed to United have actually been performed is material information to United.  Whether members' payment responsibilities are collected is material information to United.  The health care services provided to United's members is material information to United.  The reason(s) that health care services are requested and performed is material information to United.  The amount that is charged for health care services that are billed to United is material information to United.

129.     IAM submitted thousands of claims to United that misrepresented, or intended to create the false impression, that the lab services listed in the claims were performed at the rural hospital listed in the claims.  **Exhibits A** and **H** identify representative examples of these material misrepresentations.

130.     IAM submitted claims to United that misrepresented, or intended to create the false impression, that the referring medical providers listed in the claims requested that lab services be performed by the rural hospital identified in the claims submitted by IAM.  **Exhibits A - L** identify representative examples of these material misrepresentations.

131.     IAM submitted claims to United that concealed and/or failed to disclose that the lab services listed therein were requested because the referring providers listed in the claims were promised remuneration, received remuneration, or were receiving remuneration from Defendants or their unknown affiliates.  IAM, submitting claims on behalf of rural hospitals with

network agreements with United, and making partial disclosures, had a duty to disclose this information to United, but intentionally did not disclose it. IAM had knowledge of the information that was concealed or was not disclosed. **Exhibits F** and **K** identify representative examples of these material misrepresentations.

132. IAM submitted claims to United that contained myriad other species of misrepresentations regarding the nature of the lab services performed, the reasons the services were requested and performed, whether the services were requested, whether the services were performed, and/or whether member responsibility amounts were collected. Representative examples of these various types of misrepresentations are described above and in **Exhibits A - L**.

133. At the time these false representations and others alleged herein were made to United, Defendants knew that they were false, or that the representations were made recklessly, without any knowledge of the truth. Defendants knew that United did not know the information that was concealed, withheld, or otherwise incorrect.

134. Defendants instructed and/or caused IAM to make these false representations (or omissions) purposefully, and IAM made the false representations (or omissions) purposefully, intending for United to rely on the false representations (or omissions) and make payments to NMH and CMH which United would not have otherwise made.

135. United reasonably relied on the false information contained in the claims and took action, as Defendants intended, issuing payments to NMH and CMH that it would not have otherwise made and, as a result, has suffered harm in the amount paid to these facilities based on claims containing such false information, which is in excess of $40 million.

136. Dr. Michael Murphy is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because he

knowingly directed and participated in the submission of fraudulent claims to United by, among other things alleged herein: (a) signing agreements on IAM's behalf that gave IAM the purported authority to act as rural hospitals' billing agents; (b) signing agreements on IAM's behalf that purported to establish "satellite" offices in San Antonio for the rural hospitals; (c) creating the "Series" LLCs through which the kickbacks that are used to induce testing referrals are funneled and soliciting referral sources to become sham investors in such entities; (d) instructing and causing IAM to submit claims containing false and fraudulent information alleged herein; (e) making surreptitious illegal payments intended to induce physicians around the country to request laboratory testing from Sun and instructing Sun representatives to falsely assert that Mission is part of United's network of providers; (f) instructing, directing, and/or causing rural hospitals' employees to transfer millions of dollars from the rural hospitals' bank accounts to those controlled by IAM, Mission, and Sun; (g) benefiting from the fraud directly and indirectly through his ownership interests in Sun, SAM, and IAM, which were the direct recipients of transfers of funds United paid as a result of this fraudulent scheme; and (h) benefitting from the fraud directly and indirectly through his ownership interests in LMK Management, Alternate Health Corp., and Clover Trail Capital, which were indirect recipients of funds United paid as a result of this fraudulent scheme. As a direct and proximate result of Dr. Murphy's knowing and intentional direction and assistance, United was harmed in excess of $40 million.

137. Jesse Saucedo, Jr. is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because he knowingly directed and participated in the submission of fraudulent claims to United by, among other things alleged herein: (a) signing agreements on IAM's behalf that gave IAM the purported authority to act as rural hospitals' billing agents; (b) signing agreements on Sun's behalf for the

performance of the lab services at low prices, allowing the difference between the price Sun paid and the price United paid to be used to fund kickbacks to induce the referral of the lab services and for him to profit personally; (c) instructing and causing IAM to submit claims containing false and fraudulent information alleged herein; (d) making surreptitious illegal payments intended to induce physicians around the country to request laboratory testing from Mission and instructing Mission representatives to falsely assert that Mission is part of United's network of providers; and (e) benefiting from the fraud directly and indirectly through his ownership interests in Mission and IAM, which were the direct recipients of transfers of funds United paid as a result of this fraudulent scheme, and through his ownership interests in LMK Management and Clover Trail Capital, which were indirect recipients of funds United paid as a result of this fraudulent scheme. As a direct and proximate result of Saucedo's knowing and intentional assistance, United was harmed in excess of $40 million.

138. Samantha Murphy is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because she knowingly directed and participated in the submission of fraudulent claims to United by, among other things alleged herein: (a) managing claim submission processes at IAM and instructing and causing IAM to submit fraudulent claims to United; (b) covering up complaints of fraudulent billing and other misconduct received by NMH and CMH; (c) communicating with NMH and CMH employees to cover up the fraudulent scheme; (d) instructing NMH and CMH employees to transfer millions of dollars to IAM, Sun, SAM, and Mission; (e) creating and executing IAM's billing guidelines that were used in furtherance of the fraudulent scheme; and (f) purportedly overseeing Sun, Mission, and IAM's compliance programs, which allowed her to cover up the fraudulent conduct when presented with evidence from outsiders.

139. Lynn Murphy is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because she knowingly directed and participated in the submission of fraudulent claims to United by, among other things alleged herein: (a) acting as IAM's C.E.O. and managing and overseeing IAM's submission of fraudulent claims and creation of fraudulent records, which misrepresented that services were performed in rural hospitals, when she knew that they were, in fact, performed in the same building as IAM's offices, and instructing rural hospital employees to transfer money to IAM, Sun, Mission; (b) acting on behalf of Sun and Mission to manage the brokering of lab specimens to AHL and other labs, but then using IAM to knowingly submit claims that misrepresented material information about the lab services and omitted material information about why they were requested and how they were performed; (c) covering up complaints of fraudulent billing and other misconduct received by NMH and CMH; (d) creating documents submitted to United's SIU that were intended to mislead United's investigators; and (e) communicating with NMH and CMH employees to cover up the fraudulent scheme.

140. Julie Pricer is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because she knowingly directed and participated in the submission of fraudulent claims to United by acting as IAM's C.F.O., managing the creation of fraudulent invoices and other records and instructing rural hospital employees to transfer money to IAM, Sun, Mission.

141. Sun is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because it knowingly directed and participated in the submission of fraudulent claims to United by gathering the lab specimens and the requests for testing that were the basis for the submission of the fraudulent claims. **Exhibit**

**M** contains a list of representative examples of these claims. As a direct and proximate result of Sun's knowing and intentional assistance, United was harmed in excess of $40 million.

142. Mission is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because it knowingly directed and participated in the submission of fraudulent claims to United by gathering the specimens and the requests for testing that were the basis for the submission of the fraudulent claims. **Exhibit N** contains a list of representative examples of these claims. As a direct and proximate result of Mission's knowing and intentional assistance, United was harmed in excess of $40 million.

143. SAM is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because it knowingly directed and participated in the submission of fraudulent claims to United by managing the "lab programs" at NMH and CMH and acting as the conduit between Sun's gathering of lab specimens and requests for testing and using NMH and CMH to submit fraudulent claims. As a direct and proximate result of SAM's knowing and intentional assistance, United was harmed in excess of $40 million.

144. AHL is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because it knowingly directed and participated in the submission of fraudulent claims to United by performing the services that were billed for and supplying IAM with results reports that were then changed to make it appear that services were provided by the rural hospital whose billing credentials were used to submit the fraudulent claims. As a direct and proximate result of AHL's knowing and intentional assistance, United was harmed in excess of $40 million.

145.    LMK is liable as a principal for the harm caused by IAM's submission of fraudulent claims under NMH and CMH's billing credentials because it knowingly directed and participated in the submission of fraudulent claims to United by managing AHL's performance of lab services that were used as the basis to submit fraudulent claims to United. As a direct and proximate result of LMK's knowing and intentional assistance, United was harmed in excess of $40 million.

146.    Additionally, or in the alternative, Defendants are liable for IAM's fraudulent conduct via the theories of attribution of liability alleged in paragraphs 119 through 125.

## Count Two

### TORTIOUS INTERFERENCE WITH CONTRACT

### (Against Sun, Mission, SAM, IAM, and Individual Defendants)

147.    Paragraphs 1 through 146 are incorporated herein.

148.    United maintained contracts with CMH and NMH, which were subject to interference.

149.    IAM is a stranger to the contracts between United and CMH and United and NMH. IAM willfully and intentionally interfered with these contracts by using NMH and CMH's billing credentials to disguise out-of-network lab services as though they were performed by CMH and NMH, so that United would incorrectly reimburse the insurance claims under the contracts negotiated between these rural hospitals and United. IAM also willfully and intentionally interfered with these contracts by purposefully not collecting copays and deductibles from patients, as required by law and by United's contracts, so as to induce United's members to unwittingly accept services or avoid raising alarm regarding the services. These willful and intentional acts of interference caused United's harm and actual damages by causing

it to make millions of dollars of payments to CMH and NMH under their contracts, which United otherwise would not have made. To the extent that IAM was acting as the corporate agent of these facilities when it willfully and intentionally interfered with United's contracts, IAM was motivated by its own personal interests and those of the other Defendants', and the interference was contrary to the facilities' interests.

150. Sun is a stranger to the contracts between United and CMH and United and NMH. Sun willfully and intentionally interfered with these contracts by using CMH and NMH to disguise out-of-network lab services, which Sun was requested to perform, but which were performed by other out of network labs, as though they were performed by CMH and NMH, so that United would incorrectly reimburse the insurance claims under the contracts negotiated between these rural hospitals and United. These willful and intentional acts of interference caused United's harm and actual damages by causing it to make millions of dollars of payments to CMH and NMH under their contracts, which United otherwise would not have made. To the extent that Sun was acting as the corporate agent of these facilities when it willfully and intentionally interfered with United's contracts, the interference was motivated by Sun's interests and was contrary to the facilities' interests.

151. Mission is a stranger to the contracts between United and CMH and United and NMH. Mission willfully and intentionally interfered with these contracts by using CMH and NMH to disguise out-of-network lab services, which Mission was requested to perform, but which were performed by other out of network labs, as though they were performed by CMH and NMH, so that United would incorrectly reimburse the insurance claims under the contracts negotiated between these rural hospitals and United. These willful and intentional acts of interference caused United's harm and actual damages by causing it to make millions of dollars

of payments to CMH and NMH under their contracts, which United otherwise would not have made. To the extent that Mission was acting as the corporate agent of these facilities when it willfully and intentionally interfered with United's contracts, the interference was motivated by Mission's interests and was contrary to the facilities' interests.

152. SAM is a stranger to the contracts between United and CMH and United and NMH. SAM willfully and intentionally interfered with these contracts by using CMH and NMH to disguise out-of-network lab services as though they were performed by CMH and NMH, so that United would incorrectly reimburse the insurance claims under the contracts between these rural hospitals and United. These willful and intentional acts of interference caused United's harm and actual damages by causing it to make millions of dollars of payments to CMH and NMH under their contracts, which United otherwise would not have made. To the extent that SAM was acting as the corporate agent of these facilities when it willfully and intentionally interfered with United's contracts, the interference was motivated by SAM's interests and was contrary to the facilities' interests.

153. Additionally, or in the alternative, Individual Defendants are liable for IAM, Sun, SAM, and Mission's tortious interference via the theories of attribution of liability alleged in paragraphs 119 through 125. Individual Defendants each knew about IAM, Sun, SAM, and Mission's intentional interference with United's contracts and knew about their own roles in assisting IAM, Sun, SAM, and Mission accomplish such intentional interference. Individual Defendants knowingly, intentionally, and substantially assisted in IAM, Sun, SAM, and Mission's tortious interference with United's contracts, as described herein.

<u>**Count Three**</u>

**TEXAS THEFT LIABILITY ACT**

**(Against Dr. Murphy, Saucedo, Sun, Mission, and IAM)**

154.     Paragraphs 1 through 146 are incorporated herein.

155.     Dr. Murphy, Saucedo, Sun, Mission, and IAM are liable to United, under the Texas Theft Liability Act, for their theft of more than $40 million from United.

156.     United was in lawful possession and control of the property – *i.e.*, money – that was unlawfully appropriated from it by IAM, Sun, and Mission, at Dr Murphy and Saucedo's direction.  United's possession and control of the property unlawfully appropriated from it makes it an owner of that property, pursuant to Tex. Penal Code §1.07(a)(35).

157.     Dr. Murphy, Saucedo, IAM, Sun, and Mission unlawfully appropriated property, in the form of approximately $44 million, from United, intending to permanently deprive United of the property, in violation of Texas Penal Code § 31.03, and are thus liable to United for the damages caused by the thefts.

158.     Dr. Murphy, Saucedo, IAM, Sun, and Mission acquired possession and control over this property from United without United's "effective consent," as that term is used and defined in Texas Penal Code §§ 31.03(b)(1) and 31.01(3).

159.     United's consent to relinquishing possession and control of this property to IAM, Sun, and Mission was ineffective because it was induced by deception.

160.     Dr. Murphy, Saucedo, IAM, Sun, and Mission unlawfully appropriated this property by inducing United to consent to transfer the property to NMH and CMH through deception.

161.     IAM created, by words in the claims submitted to United, false impressions of facts that IAM, Sun, Mission, Dr. Murphy, and Saucedo did not believe to be true, but which were likely to, and did, affect United's judgment as to whether it should consent to transferring possession and control of the property at issue in each transaction. These false impressions created by IAM include:

a.   that the services billed for in the claims IAM submitted to United were performed by the facility identified as performing the services in the claims;

b.   that the services billed for in the claims submitted to United were referred by the medical providers listed in the claims to the rural hospital on whose behalf IAM was purportedly submitting the claims; and

c.   that the services were lawfully performed.

162.     Sun and Mission created, by words relayed to referral sources, the false impression of fact and law that they were part of United's provider network and that specimens referred to them would be considered in-network by United, which Sun and Mission did not believe to be true, but which were likely to, and did, affect medical providers' judgment in entering into the transactions by referring specimens for testing.

163.     United has been harmed in the amount of the property unlawfully appropriated from it through each of the rural hospitals through which IAM submitted claims to United, to which United issued reimbursements, and from which IAM, Sun, and Mission received transfers of said property, in approximately the following amounts:

a.   NMH - $22,000,000;

b.   CMH - $22,000,000.

164.    United seeks to recover these damages, as well as statutory damages, court costs, and reasonable and necessary attorney's fees, as provided for by Tex. Civ. Prac. & Rem. Code §134.005(a) and (b).

165.    Additionally, or in the alternative, Individual Defendants are liable for IAM, Sun, and Mission's tortious conduct via the theories of attribution of liability alleged in paragraphs 119 through 125.

## Count Four

### FRAUDULENT TRANSFERS

### (Against All Defendants)

166.    Paragraphs 1 through 146 are incorporated herein.

167.    At the direction of Dr. Murphy, Saucedo, Samantha Murphy, Lynn Murphy, and Pricer, NMH and CMH employees transferred assets to IAM, Sun, SAM, and Mission. **Exhibit O** lists transfers made, who directed the transfers and the recipients of the transfers. These transfers constitute fraudulent transfers under the Texas Uniform Fraudulent Transfers Act.

168.    Upon information and belief, many more fraudulent transfers were made at the direction of the same individuals and for the benefit of the same transferee entities.

169.    These fraudulent transfers generally occurred shortly after United paid NMH or CMH.

170.    The transfers were made to Affiliates and Insiders, as those terms are used in the Uniform Fraudulent Transfers Act.

171.    The transfers of funds from NMH and CMH to Mission, Sun, SAM, and IAM were requested and directed to be made with the actual intent to hinder, delay, and defraud United and in furtherance of the myriad frauds that were perpetrated against it.

172.    The transfers of funds from NMH and CMH to Mission, Sun, SAM, and IAM were concealed, were made without receiving reasonably equivalent value in exchange for the transfers, and NMH and CMH, as well as the Defendants that caused NMH and CMH to make the transfers, believed, or reasonably should have believed, that NMH and CMH would soon incur debts beyond their ability to pay them as they became due.

173.    Additionally, or in the alternative, Defendants are liable for IAM's tortious conduct via the theories of attribution of liability alleged in paragraphs 119 through 125.

174.    United seeks relief against the transfers described herein and any subsequent transfers, which violate the Uniform Fraudulent Transfer Act, and is entitled to:

    a.  avoidance of the transfers from NMH or CMH to Mission, Sun, or IAM and any subsequent transfers therefrom;

    b.  an attachment against property of these transfer recipients;

    c.  an injunction against further disposition of funds by these transferees and subsequent transferees; and

    d.  the appointment of a receiver to take charge of money transferred to these transferees or of other property in the transferees' possession.

### Count Five

**MONEY HAD AND RECEIVED**

**(Against all Defendants)**

175.    Paragraphs 1 through 174 are incorporated herein.

176.    Pleading further and in the alternative, if necessary, Defendants are in possession of funds that belong in good conscious to United.

177.     United made payments to NMH and CMH because it received claims that represented that they performed lab services at their respective facilities.  This was widely untrue, however, as the lab services in the claims were not performed by these facilities, but rather by various out-of-network labs.

178.     Further, the amounts United paid to NMH and CMH were for services that were induced by violations of Texas law and based on claims that violated Texas law.

179.     United made payments to NMH and CMH totaling more than $40 million.

180.     Defendants took the money that United paid NMH and CMH.

181.     The money United paid to NMH and CMH, which is now possessed by Defendants, belongs in good conscious to United.

## Count Six

### NEGLIGENT MISREPRESENTATION

### (Against IAM)

182.     Paragraphs 1 through 146 are incorporated herein.

183.     Pleading further and in the alternative, if necessary, IAM is liable to United for negligent misrepresentation.

184.     IAM made numerous material misrepresentations in the claims it submitted to United.

185.     These representations were made in the course of IAM's business, in transactions in which it had a pecuniary interest, since IAM intended for United to make payments to NMH and CMH, on whose behalf it was purportedly submitting claims, and IAM received a percentage of all reimbursements made as a result of those claim submissions.

186.    IAM failed to exercise reasonable care in these transactions and, as a result, supplied false information in the claims submitted to United, but still intended for that information to be useful for United's guidance of its own business.

187.    Such false information includes that lab services were performed by and at rural hospitals when they were, in fact, not; that lab services were requested to be performed by rural hospitals, when it fact, they were not. IAM failed to exercise reasonable care or competence in obtaining or communicating this material information contained in the claims being submitted to United.

WHEREFORE, United respectfully requests a trial by jury and that, upon final trial of this cause, the Court enter a judgment against Defendants for:

a. actual damages;

b. punitive and exemplary damages;

c. attorneys' fees, pursuant to Tex. Civ. Prac. & Rem. Code § 134.005;

e. prejudgment interest at the maximum rate allowed by law;

f. post-judgment interest at the maximum rate allowed by law; and

e. all such other relief deemed just by the Court, both legal and equitable.

Respectfully submitted, this 18th day of April, 2018.

/s/ Stephen W. Mooney
Stephen W. Mooney
Texas Bar No. 14319100

FIGARI & DAVENPORT, LLP

Andrew G. Jubinsky
andy.jubinsky@figdav.com
Raymond Earl Walker
ray.walker@figdav.com

WEINBERG, WHEELER, HUDGINS
GUNN & DIAL, LLC

Stephen W. Mooney
smooney@wwhgd.com
Adam J. Sinton
asinton@wwhgd.com

901 Main Street, Suite 3400
Dallas, TX 75202-3796
Telephone: (214) 939-2000
Facsimile: (214) 939-2030

3344 Peachtree Road NE, Suite 240
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433